PROCTER & GAMBLE COMPANY, Appellant,

v.

STONEHAM, Appellee.

[Cite as *Procter & Gamble Co. v. Stoneham* (2000), 140 Ohio App.3d 260.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–990859.

Decided Sept. 29, 2000.

262

*Dinsmore & Shohl, Nancy A. Lawson, Mark A. Vander Laan* and *Lawrence R. Elleman; Howrey, Simon, Arnold & White, Mark D. Wegener, Kenneth W. Brothers* and *Gary Thompson,* for appellant.

*Lindhorst & Dreidame, Leo J. Breslin* and *James C. Frooman; Kirkland & Ellis, Brian D. Sieve* and *Anne J. McClain,* for appellee.

HILDEBRANDT, Presiding Judge.

Plaintiff-appellant, the Procter & Gamble Company ("P&G"), appeals from the judgment of the trial court dismissing its claims against defendant-appellee, Paul Stoneham, for breach of contract and misappropriation of trade secrets. P&G sought damages and injunctive relief against Stoneham, claiming that he had violated a non-compete agreement that he had signed while employed at P&G and that he had misappropriated trade secrets when he began working for a company called Alberto–Culver. The case was tried to a judge.

Upon Stoneham's motion, the trial court dismissed P&G's claims pursuant to Civ.R. 41(B), which states in part, "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant * * * may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." Because we hold that the court's decision was erroneous as a matter of law and contrary to the manifest weight of the evidence, we reverse the judgment and remand the cause for further proceedings.

SUMMARY OF FACTS

The massive amount of testimony and evidence presented to the trial court must be, for practical purposes, substantially condensed in this opinion. Moreover, because the record in the proceeding below has been sealed from public disclosure, this court has taken steps to refrain from identifying any specific trade secret asserted by P&G, causing us to refer instead to categories of evidence submitted in support of this claim. We believe that disposition of this case can be accomplished without disclosure of information that P&G considers confidential.

Paul Stoneham worked for P&G for thirteen years. He had a master's degree in marketing. During the latter part of his employment, he worked in the haircare division, focusing primarily on hair-conditioning products. As a senior-level manager, he had responsibility for international marketing. As a member of several teams of managers formulating P&G's global business goals and strategies related to haircare, Stoneham was required to know and use information such as market research results, financial data related to the costs and profits of the products, and the technological developments in existing and new products.

As part of its drive to substantially expand its global haircare business, P&G obtained raw market research data from a market research firm. The marketing division compiled the information for use in developing consumer models, determining the product areas in which P&G would expand or reduce its business, assessing the types of advertising that were most successful for different products, and creating a line of products that would optimize P&G's profits. Stoneham's expertise was the foreign markets, that is, the markets other than the United States, and the needs of the foreign consumers, the products that sold best in the foreign markets, the areas in which P&G should concentrate its resources to increase sales in haircare products, and the types of claims and advertising that would be most successful in foreign markets.

As part of his job, Stoneham was also privy to the development of new haircare products by P&G. He knew, among other things, which products were closest to market, when and where they would be launched, the target consumers, the type

of advertising to be used, the strengths and weaknesses of the products, the strengths and weaknesses of the company's scientific backup for its claims about the products, the price for the new products, and the targeted profits. He was also involved in the "relaunch" or revitalization of existing products, and knew, among other things, which products were going to be relaunched, the perceived weaknesses of the products, the changes made or to be made in the products, the changes in the advertising and marketing focus, and the anticipated costs of the relaunch.

As a member of worldwide multi-functional teams at P&G, Stoneham developed a confidential ten-year marketing plan for one of P&G's hair-conditioning products, participated in the development of new products, and helped develop a ten-year plan for P&G's best-selling brand, Pantene. No one was more knowledgeable about the foreign marketing of P&G's haircare products, and no one was more knowledgeable about P&G's hair-conditioning products, both existing and potential, than Stoneham.

When he reached a certain management level at P&G, Stoneham, like other employees at that level, was given the opportunity to obtain P&G stock options. Only about ten percent of P&G's employees, the highest levels of management, were eligible for these options. To receive the stock options, Stoneham was required to sign an agreement not to compete with P&G for three years after the termination of his employment. Agreeing to the covenant not to compete was entirely voluntary, but failure to agree would have required Stoneham to forgo the stock options. Stoneham signed the non-compete agreement. Like all other employees at P&G, Stoneham had signed a confidentiality agreement when he was hired, in which he had agreed not to disclose any of P&G's confidential information or trade secrets.

In 1998, Stoneham decided to take a job with Alberto–Culver, a company whose haircare products, including its conditioners, competed with P&G products to some extent. Alberto–Culver's VO5 brand of hair conditioner was the best-selling leave-in conditioner on the market at the time. Stoneham's position was to be President of Alberto–Culver International, the complement to the company's President of Alberto–Culver U.S.

Shortly after he accepted the position, P&G filed suit, alleging that Stoneham had breached the covenant not to compete and that his employment with Alberto–Culver posed an immediate threat that P&G's trade secrets would be disclosed. Following a hearing on P&G's requests for a preliminary and a permanent injunction, the trial court held that P&G had not established an entitlement to relief.

## P&G'S SIXTH ASSIGNMENT OF ERROR

■ We first address P&G's sixth assignment of error, in which P&G contends that the trial court erred in applying the clear-and-convincing standard of proof in deciding P&G's claim for misappropriation of trade secrets. Determination of the appropriate standard of proof (and standard of review for this court) is complicated by the nature of the action and P&G's request for permanent injunctive relief.

P&G's complaint alleged that Stoneham had breached the non-compete agreement when he began working for Alberto–Culver. The complaint also alleged that Stoneham had misappropriated trade secrets in violation of R.C. 1333.62. P&G requested monetary damages, as well as a preliminary injunction and a permanent injunction.

■■ The purpose of a preliminary injunction is to preserve a status between the parties pending a trial on the merits.[1] Ordinarily, a party requesting a preliminary injunction must show that (1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) the plaintiff will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be served by the injunction.[2]

■ A permanent injunction is not considered an interim remedy. It is issued after a hearing on the merits in which a party has demonstrated a right to relief under the applicable substantive law.[3] A party seeking a permanent injunction must show that the injunction is necessary to prevent irreparable harm and that the party does not have an adequate remedy at law.[4] A party seeking

---

1. See *Consun Food Industries, Inc. v. Fowkes* (1991), 81 Ohio App.3d 63, 69, 610 N.E.2d 463, 467.

2. See, *e.g., Vanguard Transp. Sys., Inc. v. Edwards Transfer & Storage Co.* (1996), 109 Ohio App.3d 786, 790, 673 N.E.2d 182, 184; *Corbett v. Ohio Bldg. Auth.* (1993), 86 Ohio App.3d 44, 49, 619 N.E.2d 1145, 1148; *Johnson v. Morris* (1995), 108 Ohio App.3d 343, 352, 670 N.E.2d 1023, 1029.

3. See, *e.g., Natl. City Bank of Cleveland v. Natl. City Window Cleaning Co.* (1963), 174 Ohio St. 510, 23 O.O.2d 146, 190 N.E.2d 437, paragraph two of the syllabus (admission of affidavits is authorized where provisional remedy such as a temporary injunction is sought, but admission of affidavits over objection is unauthorized in the trial of an action on its merits, where the principal objective is the procuring of a permanent injunction); *United Auto Workers, Local 1112 v. Philomena* (1998), 121 Ohio App.3d 760, 791, 700 N.E.2d 936, 957.

4. See *Zavakos v. Zavakos Ent., Inc.* (1989), 63 Ohio App.3d 100, 103, 577 N.E.2d 1170, 1172; *Dayton Metro. Hous. Auth. v. Dayton Human Relations Council* (1992), 81 Ohio App.3d 436, 442, 611 N.E.2d 384, 388; *Lemley v. Stevenson* (1995), 104 Ohio App.3d 126, 136, 661 N.E.2d

either type of injunction must ordinarily prove the required elements by clear and convincing evidence.[5]

The Supreme Court of Ohio has held that when an injunction is authorized by statute, normal equity considerations do not apply, and a party is entitled to an injunction without proving the ordinary equitable requirements, upon a showing that the party has met the requirements of the statute for issuance of the injunction.[6] In this case, R.C. 1333.62 authorizes the issuance of an injunction upon a showing that one party has misappropriated another's trade secrets. Under *Ackerman*, P&G's request for an injunction to remedy a violation of Ohio's Uniform Trade Secrets Act would have required P&G to prove, by a preponderance of the evidence, that a violation of the statute had occurred.[7] P&G would still have been required to prove by clear and convincing evidence that it was entitled to an injunction on its breach-of-contract claim.

■ However, in *State ex rel. Jones v. Hamilton Cty. Bd. of Commrs.*,[8] this court held that the rule in *Ackerman* is limited to those statutes that contain specific criteria that the court must use in determining entitlement to an injunction. When a statute merely provides that a party is entitled to injunctive relief as well as other types of relief, there is no "statutory injunction" within the meaning of *Ackerman*, and the party requesting the injunction must use the general equitable principles governing the issuance of injunctive relief.

In this case, the applicable statute provides for injunctive relief but does not contain the statutory guidelines that *Jones* held necessary for the application of the *Ackerman* rules. The standards therefore revert to the normal equity rules for issuance of an injunction. To be entitled to injunctive relief on either of its claims, P&G was required to prove its case by clear and convincing evidence.

---

237, 244; *Strah v. Lake Cty. Humane Soc.* (1993), 90 Ohio App.3d 822, 830–831, 631 N.E.2d 165, 170.

5. See *Vanguard, supra,* at 790, 673 N.E.2d at 184 (preliminary injunction); *Dayton Metro. Hous. Auth., supra,* at 442, 611 N.E.2d at 388 (permanent injunction).

6. See *Ackerman v. Tri–City Geriatric & Health Care* (1978), 55 Ohio St.2d 51, 56, 9 O.O.3d 62, 65, 378 N.E.2d 145, 148; *State ex rel. Pizza v. Rezcallah* (1998), 84 Ohio St.3d 116, 123, 702 N.E.2d 81, 87–88.

7. This analysis may explain the decision of the court in *Sovereign Chem. Co. v. Condren* (Apr. 22, 1998), Summit App. Nos. 18285 and 18465, unreported, 1998 WL 195876, cited by both of the parties, in which the court held that a request for a preliminary injunction to enjoin misappropriation of trade secrets was judged pursuant to the "clear-and-convincing" standard, while requests for permanent injunctions were judged under a preponderance-of-the-evidence standard.

8. (1997), 124 Ohio App.3d 184, 189, 705 N.E.2d 1247, 1250.

The trial court therefore did not err in applying a "clear-and-convincing" standard to P&G's claim for injunctive relief for breach of contract and misappropriation of trade secrets.

█ Next, we turn to the actual issue that is before us for review. The trial court in this case consolidated the hearing on the preliminary injunction with a hearing on the merits for the permanent injunction, as permitted by Civ.R. 65(B)(2). A determination of the merits effectively renders moot the consideration of a "likelihood of success on the merits" for the preliminary injunction, and, accordingly, the decision to grant or deny a permanent injunction moots the issue of the right to a preliminary injunction.[9] Thus, the issue on appeal is the propriety of the trial court's denial of the permanent injunction.

█ In reviewing a trial court's decision to grant or deny an injunction, this court normally uses an abuse-of-discretion standard. However, in this case, the trial court dismissed P&G's claim on the merits pursuant to Civ.R. 41(B)(2), holding that P&G had not established entitlement to relief under the facts and law applicable to its claims. This court reviews Civ.R. 41(B)(2) dismissals to determine whether the trial court's decision was erroneous as a matter of law or contrary to the manifest weight of the evidence.[10]

█ We believe that the appropriate standard of review in this case is whether the trial court's conclusion that P&G had failed to prove its claims for breach of contract and misappropriation of trade secrets is erroneous as a matter of law or contrary to the manifest weight of the evidence. If it is not, then the trial court did not err in refusing to grant injunctive relief. If it is, we must use the abuse-of-discretion standard to determine whether the trial court abused its discretion in declining to grant injunctive relief.[11]

As discussed below, we hold that the trial court did err in dismissing the case pursuant to Civ.R. 41(B)(2) and in denying injunctive relief at that stage of the proceedings. Because the case was dismissed at the close of P&G's case, Stoneham did not present his case in defense. We must therefore remand this

---

9. See *Van Camp v. Riley* (1984), 16 Ohio App.3d 457, 459, 16 OBR 539, 540–541, 476 N.E.2d 1078, 1080.

10. *Janell, Inc. v. Woods* (1980), 70 Ohio App.2d 216, 217, 24 O.O.3d 266, 266–267, 435 N.E.2d 1138, 1139; *Bank One, Dayton, N.A. v. Doughman* (1988), 59 Ohio App.3d 60, 62–63, 571 N.E.2d 442, 444.

11. As this court has held, an abuse of discretion connotes more than an error on the trial court's part; the decision must be shown to be arbitrary, unreasonable, or unconscionable. See, *e.g.*, *Wille v. Hunkar Labs., Inc.* (1998), 132 Ohio App.3d 92, 109, 724 N.E.2d 492, 504.

case for further hearing on Stoneham's defense and for adjudication by the court at the close of all of the evidence.

## P&G'S FIRST AND FIFTH ASSIGNMENTS OF ERROR

In its first assignment of error, P&G contends that the trial court failed to use the appropriate standards for determining the validity of the non-compete agreement. P&G also claims, in a related assignment of error (the fifth), that the trial court erroneously held that P&G had failed to prove that Stoneham was exposed to trade secrets and confidential information while employed at P&G. We sustain these two assignments of error.

In Ohio, non-compete agreements that are reasonable are enforced,[12] and those that are unreasonable are "enforced to the extent necessary to protect an employer's legitimate interest."[13] The Supreme Court of Ohio has stated, "A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public."[14]

To determine whether a particular non-compete agreement is reasonable, the court must consider whether the agreement contains time and space limitations, whether the employee is the sole contact with the customer, whether the employee has confidential information and trade secrets, whether the agreement seeks to limit only unfair competition or is designed more broadly to eliminate ordinary competition, whether the agreement seeks to stifle the employee's inherent skill and experience, whether the benefit to the employer is disproportional to the detriment to the employee, whether the agreement bars the employee's sole means of support, whether the skills that the agreement seeks to restrain were actually developed during the employment, and whether the forbidden employment is merely incidental to the main employment.[15]

The trial court in this case did not cite or refer to the *Raimonde* factors explicitly. Our review of the trial court's decision convinces us that the trial court also failed to implicitly use any of these factors in determining the

---

12. See *Levine v. Beckman* (1988), 48 Ohio App.3d 24, 27, 548 N.E.2d 267, 270 (Ohio follows rule of reasonableness in enforcing non-compete agreements).

13. See *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544, paragraph one of the syllabus.

14. See, *id.*, paragraph two of the syllabus. See, also, *Rogers v. Runfola & Assoc., Inc.* (1991), 57 Ohio St.3d 5, 8, 565 N.E.2d 540, 543.

15. See *Raimonde, supra,* at 25, 71 O.O.2d at 14, 325 N.E.2d at 547; *Rogers, supra,* at 8, 565 N.E.2d at 543.

agreement's validity, with the possible exception of Stoneham's receipt of confidential information or trade secrets. The court noted only that P&G had "waive[d] the non-compete provision as to some executives who [had] the same exposure to confidential information," that "[t]he non-compete agreement [was not] a condition of receipt of information," and that P&G had failed to show "that [Stoneham] was taken into Procter & Gamble's confidence to any greater extent because he signed the agreement." The court also stated that the non-competition covenant was "not being used to protect confidential information, but it is used as a measure to retain valued employees."

None of these factors is relevant, pursuant to *Raimonde,* to the enforceability of the covenant. Although they might be relevant to a determination of whether the contract was supported by consideration, such an inquiry was unnecessary because the undisputed evidence showed that Stoneham received valuable stock options in consideration for his agreement not to compete. Therefore, we hold that the trial court erred as a matter of law in failing to judge the enforceability of the agreement by the factors set forth in *Raimonde.*

The court's error was not harmless because P&G presented clear and convincing evidence to show that the non-compete agreement was reasonable under *Raimonde.* The record demonstrates that Stoneham had access to confidential information and trade secrets, that the agreement sought to limit only unfair competition by prohibiting Stoneham's employment in the international haircare industry with a direct competitor, that the enforcement of the agreement would not stifle Stoneham's inherent skills in marketing or destroy Stoneham's sole means of support, that Stoneham could work at Alberto–Culver in areas other than haircare for the term of the non-compete agreement, and that Stoneham's talents and knowledge in the area of haircare marketing were actually developed during his employment with P&G. The three-year limitation on competition was shown to be reasonable by evidence that the confidential information to which Stoneham had access had a useful life of three to five years.

As stated above, the trial court's decision indicated that it might have considered whether Stoneham was exposed to confidential information and trade secrets. It is not clear from the decision, however, whether the court credited or discounted all of the evidence presented regarding Stoneham's receipt of confidential and trade-secret information. The court at one point stated that "[m]arket research [was] available to competitors," and "documents claimed to be confidential * * * were not so marked pursuant to company security requirements, and this Court will not infer confidential status when the company itself has not done so where the same information is possessed by employees not subject to non-compete contracts, * * * and where [P&G] waives the non-

compete provision as to some executives who have the same exposure to confidential information."

To the extent that the trial court held that Stoneham was not exposed to confidential information and trade secrets, the court's decision is contrary to the manifest weight of the evidence. "Confidential information," as that term was used in *Raimonde* in the context of enforcement of covenants not to compete, is not defined under Ohio law. "Confidential" can mean "known only to a limited few; not publicly disseminated." [16] "Trade secrets" is defined by R.C. 1333.61(D), which states,

" 'Trade secret' means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

"(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

"(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

In determining the existence of a trade secret, a trial court must consider (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information withheld from competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. [17]

The court in this case incorrectly focused on only one of the factors identified above: the precautions taken to guard the secrecy of the information. The overwhelming weight of the evidence presented at the hearing demonstrates that Stoneham was privy to massive amounts of information that constituted trade secrets.

---

16. Webster's Third New International Dictionary, Unabridged (1981) 476.

17. *Pyromatics, Inc. v. Petruziello* (1983), 7 Ohio App.3d 131, 134–135, 7 OBR 165, 168–170, 454 N.E.2d 588, 592.

Although the court correctly noted that the raw data that P&G received from the marketing firm was available to any other company that could pay for it, P&G presented evidence that the data was compiled and used in a way unique to P&G, and that it could have been duplicated only by the expenditure of vast amounts of time, money, and other resources. P&G used the material to create a consumer model to guide all of the marketing for particular products. The information was, for lack of a better term, cross-indexed so that P&G could study subsets of the information, such as the consumer behavior in a certain country related to a certain product. It was not the raw data but the analysis and interpretation of the data that P&G considered confidential. The court's conclusion that the marketing data known to Stoneham was not a trade secret or confidential information was contrary to the manifest weight of the evidence.

Even if some of the written information to which Stoneham had access was not marked as confidential in accordance with company procedure, P&G presented substantial evidence that numerous documents that contained confidential information and that bore the stamp of confidentiality were in Stoneham's possession and used by him during his employment. These documents contained information about new products and their costs, advertising and marketing; about changes in marketing strategy for existing products; about consumer research analysis performed by P&G at great expense and effort, and the consumer research models that resulted from its analysis; and about P&G's future plans for its haircare business on an international level. All of this information was of a confidential nature and constituted trades secrets. To the extent that the trial court held that this information was not confidential, the court's decision was contrary to the manifest weight of the evidence.

Therefore, we sustain P&G's first and fifth assignments of error. P&G demonstrated that the non-compete agreement was reasonable when analyzed in accordance with the standards that were enumerated in *Raimonde,* and the trial court's contrary decision was erroneous as a matter of law. We also hold, in response to P&G's fifth assignment of error, that the trial court erred to the extent that it held that Stoneham was not privy to confidential information and trade secrets. The overwhelming weight of the evidence demonstrated that substantially all of Stoneham's work, particularly in the last two years of his employment, required the use of confidential information and trade secrets.

SECOND, THIRD, AND FOURTH ASSIGNMENT OF ERROR

In its second, third, and fourth assignments of error, P&G claims that the trial court erred in holding that P&G had presented no evidence of actual or threatened harm from Stoneham's employment with Alberto–Culver. The court based its decision on the lack of evidence of lost profits at P&G, of increased profits at Alberto–Culver, or of a "change of strategy or any defensive measures

taken by Procter & Gamble as a result of [Stoneham's] departure * * *." The court also held that the "inevitable-disclosure" rule did not apply to this case.

We agree that the trial court erred as a matter of law in holding that P&G was required to present evidence of actual harm. A threat of harm is a sufficient basis on which to grant injunctive relief.[18] We also hold that the trial court incorrectly focused on whether P&G had taken defensive measures to prevent harm from Stoneham's competition in determining whether P&G had demonstrated a threat of harm, and that the determination that P&G had failed to demonstrate any threat of harm was contrary to the manifest weight of the evidence.

In actions to enforce covenants not to compete, Ohio courts have held that an actual threat of harm exists when an employee possesses knowledge of an employer's trade secrets and begins working in a position that causes him or her to compete directly with the former employer or the product line that the employee formerly supported.[19] Although the courts do not refer to this evidentiary proposition as "inevitable use" or "inevitable disclosure," the concepts are the same. According to the inevitable-disclosure rule, a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment.[20]

P&G presented clear and convincing evidence that Stoneham had an intimate knowledge of P&G's confidential information and trade secrets, and that Stoneham's position with Alberto–Culver resulted in direct competition between the products that Stoneham formerly supported and the new products for which he had responsibility. Under these circumstances, Stoneham's use of P&G's information and secrets was a very real threat. P&G presented other evidence that Stoneham's use or disclosure of P&G's information was not just a threat, it was a substantial probability.

---

**18.** See *Levine, supra,* at 28, 548 N.E.2d at 271–272; *AgriGeneral Co. v. Lightner* (1998), 127 Ohio App.3d 109, 115, 711 N.E.2d 1037, 1042.

**19.** See *Levine, supra,* at 27–28, 548 N.E.2d at 271; *Atlantic Tool & Die v. Kacic* (Nov. 18, 1998), Medina App. No. 2717–M, unreported, 1998 WL 801913; *Hess Hardware Co. Inc. v. Betschman* (Apr. 7, 1995), Huron App. No. H–94–18, unreported, 1995 WL 152197.

**20.** See *PepsiCo, Inc. v. Redmond* (C.A.7, 1995), 54 F.3d 1262, 1269; *EarthWeb, Inc. v. Schlack* (S.D.N.Y.1999), 71 F.Supp.2d 299, 309; *Lumex, Inc. v. Highsmith* (E.D.N.Y.1996), 919 F.Supp. 624, 629.

Numerous P&G management employees testified that a competitor could use Stoneham's knowledge of P&G's confidential information and trade secrets to avoid the time-consuming and expensive steps that P&G took to develop the information, thus giving the competitor a financial advantage. A competitor would know any weaknesses of P&G's products, such as the marginal scientific support for a product claim, that would not be known to the public and could exploit those weaknesses. P&G's pipeline products could be replicated by a competitor without the time and expense of research and testing. By knowing the areas that P&G had identified as growth areas for its products (for instance, a certain market or type of product), the competitor could "pre-empt" P&G's entry into the market with another product, thus depriving P&G of a competitive advantage in the market if the product did well or destroying the marketability of a product or concept if the product performed poorly.

Stoneham's testimony established the very real threat of the use of P&G's confidential information and trade secrets by Alberto–Culver in the manner described by P&G's witnesses. When Stoneham began working for Alberto–Culver, a relaunch of the VO5 product was ready to begin. Stoneham immediately stopped the relaunch so that he could implement plans that he had developed rather than Alberto–Culver's former plans to increase sales of the company's haircare products. He set a goal to build VO5 into one of the top three global haircare brands. P&G's Pantene was then the number one brand. Stoneham created the same type of multi-functional global teams that P&G had for its products to reach this goal, and Stoneham coached and trained these teams. During one of the meetings, the team evaluated Pantene's advertising strategy.

Along with other upper-level managers at Alberto–Culver, Stoneham developed an initiative called Benchmark 2000, the purpose of which was to identify the best haircare products from around the world and to use information about those products to improve Alberto–Culver's products and expand their sales. Many of the top-selling brands around the world are P&G products.

Stoneham's testimony shows that the threat of harm identified by P&G's other managers was not only possible or speculative, but was substantially likely to result. In his new employment, Stoneham directly targeted the very products he worked on when employed at P&G for increased competition from Alberto–Culver products. He set up global teams like the ones that he had been on at P&G to identify Alberto–Culver's strategies for competing with P&G specifically and increasing sales in haircare generally. P&G's advertising campaigns were specifically discussed. Based on this evidence, we hold that P&G presented clear and convincing evidence that Stoneham either had already used some of P&G's trade secrets or was substantially likely to use its trade secrets to benefit Alberto–Culver. The trial court erred in holding that P&G had failed to

demonstrate that a threat of harm was imminent from Stoneham's continued participation in the haircare business of Alberto–Culver International.

## THE TRIAL COURT'S DENIAL OF INJUNCTIVE RELIEF

Finally, we must determine whether the trial court's decision to deny injunctive relief, although erroneous, was also an abuse of discretion. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude [was] unreasonable, arbitrary or unconscionable." [21] In this context, a decision is unreasonable if "there is no sound reasoning process that would support that decision." [22]

Based on P&G's demonstration, at the stage of the proceedings at which the trial court dismissed the action, of a clear right to relief in the face of the threatened disclosure of trade secrets, and the likely impossibility of ascertaining the actual damages that would result from Stoneham's continued employment with a direct competitor, we believe that the trial court's denial of injunctive relief was not supported by a sound reasoning process. We therefore hold that, based on the evidence that had been submitted at the time the cause was dismissed, the denial of injunctive relief was an abuse of discretion.

## CONCLUSION

The evidence presented by P&G clearly and convincingly demonstrated that the covenant not to compete signed by Stoneham was valid and enforceable. Clear and convincing evidence also established a threat of harm to P&G from Stoneham's employment with Alberto–Culver and his use or disclosure of P&G's trade secrets and confidential information. The trial court's denial of injunctive relief was an abuse of the court's discretion. The judgment of the trial court is reversed, and this cause is remanded for presentation of Stoneham's case in defense of the action and for further consideration of the issuance of a permanent injunction in accordance with the appropriate legal standards.

*Judgment reversed*
*and cause remanded.*

DOAN, J., concurs.

PAINTER, J., concurs separately.

---

21. See *Wille, supra,* at 109, 724 N.E.2d at 504.

22. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601.

PAINTER, Judge, concurring.

If this non-compete agreement be not valid, no non-compete agreement would ever be enforceable. The foregoing is a general comment, because an agreement such as this will not always be valid—the facts of each individual case are paramount. But the trial court's ruling would negate almost all non-competition agreements. If Ohio is to go the way of California, where no covenants are legal except in a sale of a business, that would be a legislative decision. But, under present law, Ohio enforces non-compete agreements to the extent reasonably necessary to protect the employer's legitimate interests.

Though I believe that continued employment alone is sufficient consideration to support a covenant not to compete, here Stoneham received stock options that he exercised for a profit of $684,000. Stoneham made the deal. He should abide by it, unless it is ultimately found to be unenforceable, a decision we cannot make today because of the unfortunate procedural posture of this case.

The trial court found that P&G had not made out a case—a ruling we reverse as being against the manifest weight of the evidence and erroneous as a matter of law. That is, the judge blew the whistle partway into the second half, ruling that P&G had failed to score in the first half. Stoneham must be given the opportunity to present the rest of his defense, after which the trial court will then make a decision on enforceability. This step is necessary because there may be some evidence in this case that could negate what P&G has initially established. The trial judge, in evaluating the covenant after the close of all the evidence, should be guided by our decision today.

The lead opinion adopts the inevitable-disclosure rule. That rule is in conformity with common sense. It is just such inevitable use that the non-compete agreement here targets. An employer should not have to demonstrate any actual or overtly threatened harm—the fact that an ex-employee, possessed of a substantial amount of confidential information, is now with a competitor in a position where that knowledge would produce a competitive advantage should be sufficient to require an injunction. Also, though I agree that the abuse-of-discretion standard applies to a trial court's decision whether to grant an injunction, I believe that, in a case such as this, if an employer proves it is entitled to an injunction, it would be unreasonable, and thus an abuse of the court's discretion, to refuse injunctive relief.