FREEMAN INDUSTRIAL PRODUCTS, L.L.C., et al., Appellants,

v.

ARMOR METAL GROUP ACQUISITIONS, INC., et al., Appellees.

[Cite as *Freeman Indus. Prods., L.L.C. v. Armor Metal Group Acquisitions, Inc.*, 193 Ohio App.3d 438, 2011-Ohio-1995.]

Court of Appeals of Ohio,
Twelfth District, Clermont County.

Nos. CA2010-09-071 and CA2010-09-080.

Decided April 25, 2011.

440

Donald W. White, Graydon Head & Ritchey L.L.P., and Michael A. Roberts, for appellants.

Finney, Stagnaro, Saba, and Patterson Co., L.P.A., Peter Saba, and Jeffrey M. Nye, for appellees.

BRESSLER, Judge.

{¶ 1} Plaintiff-appellant, Freeman Enclosure Systems, appeals the decision of the Clermont County Court of Common Pleas granting a preliminary injunction in favor of defendant-appellee, Armor Metal Acquisitions ("Armor Metal"). We reverse the decision of the trial court.

## I. Statement of Facts

{¶ 2} Dale and Bonnie Freeman owned and operated Victory Custom Trailers, Inc., d.b.a. Victory Industrial Products Inc. ("VIP"), which specialized in manufacturing accessory equipment and custom enclosures for backup power generators. On May 18, 2007, VIP, as the seller, and the Freemans, as shareholders, entered into an asset purchase agreement ("APA") with WHI, a Delaware limited-liability company, which assumed the name Victory Industrial Products, L.L.C. ("Victory Delaware"). According to the APA, the Freemans sold VIP's assets to Victory Delaware for $6,249,715.

{¶ 3} Before completing the sale, the Freemans entered into employment contracts with Victory Delaware, with Bonnie acting as the vice president and chief operating officer and Dale acting as president. Within the APA and the employment contracts, the Freemans agreed to several restrictive covenants, including a noncompete clause, a clause forbidding the Freemans from soliciting VIP's former employees, a confidentiality agreement, and an agreement not to solicit any of Victory Delaware's customers or vendors. Several of VIP's employees also entered into separate employment agreements with Victory Delaware (the counterclaim defendants) and signed restrictive covenants similar to the ones the Freemans signed.

{¶ 4} Prior to the APA, the Freemans planned to move VIP's production to a plant in Batavia ("the plant"), and they financed $6 million of the plant's purchase price through personal guarantees. Before becoming Victory Delaware, WHI committed to lease the plant for 12 years and agreed to pay graduated lease payments totaling $6,648,252 ("the Batavia lease"). The Batavia lease was included in the APA's schedule 1.3(i) as a document to be delivered at the time of closing and included as Exhibit C to the APA. Victory Delaware used the plant as its operation center in Ohio and also manufactured out of a facility in Arizona.

{¶ 5} After a year of employment with Victory Delaware, the Freemans terminated their employment and signed termination agreements effective July 2008. Within the termination agreements, the Freemans affirmed the restrictive covenants from the APA and their employment contract. At that point, Dale accepted employment with a generator-distribution company and Bonnie stayed at home to raise the Freemans' youngest daughter.

{¶ 6} On March 17, 2010, Victory Delaware dissolved and transferred all its Ohio- and Arizona-based operations and assets to a third-party trustee so that the trustee could sell the business and/or liquidate the assets to the greatest benefit of Victory Delaware's creditors. As a result of its dissolution, Victory Delaware defaulted on the Batavia lease, leaving the Freemans open to a $5,282,755 personal loss. To avoid this loss, the Freemans considered selling the plant, or in the alternative, starting another business that used the plant for production. Given the economic downturn, the Freemans chose to start a new business and considered buying Victory Delaware's assets from the trustee.

{¶ 7} Eventually, Armor Metal approached the trustee and offered to purchase Victory Delaware, but its offer was rejected by the trustee, and an auction was held to sell Victory Delaware's assets. The Ohio assets were dispersed among over 40 buyers, including the Freemans, who purchased a number of lots. Armor Metal ultimately purchased Victory Delaware's intellectual property, including the company name and the Freemans' restrictive covenants, for $30,000.

{¶ 8} Operating as Victory Industrial Products, Armor Metal began manufacturing accessory equipment and custom enclosures for backup power generators, the same work performed by VIP before it sold the company to Victory Delaware. David Schmitt, Armor Metal's owner, hoped to employ Dale Freeman as president, but Dale refused the offers of employment because he and Bonnie needed to start a business in order to protect their personal guarantees on the plant.

{¶ 9} In hopes of starting a business that utilized the plant, the Freemans began the process of contacting possible employees and discussed employment options with the counterclaim defendants. Aware of the Freemans' solicitation of former employees, Armor Metal sought a temporary injunction enjoining the Freemans and counterclaim defendants from operating a business in violation of the restrictive covenants discussed above.

{¶ 10} After an extensive hearing on the matter, the trial court granted the preliminary injunction, and enjoined the Freemans and counterclaim defendants from acting in contravention of the applicable restrictive covenants. In a consolidated appeal, the Freemans and counterclaim defendants challenge the trial court's ruling, asserting the following assignments of error. Because we find the Freemans' third assignment of error dispositive of this appeal, we will discuss it first.

## II. Breach–of–Contract Claim

{¶ 11} Assignment of Error No. 3:

{¶ 12} "The trial court misinterpreted the scope and assignability of Section 5.1(A) of the APA."

{¶ 13} In their third assignment of error, the Freemans argue that the trial court abused its discretion by finding that Armor Metal was likely to succeed on its claim that the restrictive covenants within the APA were enforceable even though Victory Delaware defaulted on the Batavia lease. Finding this argument meritorious, we sustain the Freemans' assignment of error.

## A. Injunction Standard

{¶ 14} In general, "[t]he purpose of a preliminary injunction is to preserve a status between the parties pending a trial on the merits." *Procter & Gamble Co. v. Stoneham* (2000), 140 Ohio App.3d 260, 267, 747 N.E.2d 268. Further, "[t]he right to an injunction must be clear and the proof thereof clear and convincing, and the right established by the strength of plaintiffs' own case rather than by any weakness of that of his adversary." *White v. Long* (1967), 12 Ohio App.2d 136, 140, 41 O.O.2d 200, 231 N.E.2d 337. In considering a preliminary injunction, the court considers whether "(1) the movant has shown a strong or substantial likelihood or probability of success on the merits, (2) the movant has shown irreparable injury, (3) the preliminary injunction could harm third parties, and (4) the public interest would be served by issuing the preliminary injunction." *Union Twp. v. Union Twp. Professional Firefighters' Local 3412* (Feb. 14, 2000), Clermont App. No. CA99–08–082, 2000 WL 189959.

{¶ 15} As this court has stated, "[a] preliminary injunction is a provisional remedy, which is defined as a 'remedy other than a claim for relief.' " *N. Fairfield Baptist Church v. G129, L.L.C.*, Butler App. No. CA2009–11–281, 2010-Ohio-2543, 2010 WL 2252490, ¶ 16, citing R.C. 2505.02(A)(3); *State ex rel. Butler Cty. Children Servs. Bd. v. Sage* (2002), 95 Ohio St.3d 23, 24, 764 N.E.2d 1027.

{¶ 16} In *N. Fairfield Baptist Church,* we also noted that because preliminary injunctions are considered interlocutory, tentative, and impermanent in nature, a trial court's decision does not become a final, appealable order unless it fulfills the two-pronged test set forth in R.C. 2505.02(B)(4): "(a) The order in effect determines the action with respect to the provisional remedy and prevents a judgment in the action in favor of the appealing party with respect to the provisional remedy" and "(b) The appealing party would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action."

{¶ 17} However, there is no question that this appeal is proper and based on a final, appealable order, given the subject matter involving possible trade-secret misappropriation and the enforceability of employee noncompete clauses. *Premier Health Care Servs., Inc. v. Schneiderman* (Dec. 28, 2001), Montgomery App. No. 18795, 2001 WL 1658167. "The issue whether to grant or deny an injunction is a matter solely within the discretion of the trial court, and a

reviewing court will not disturb the judgment of the trial court in the absence of a clear abuse of discretion. Further, in determining whether to grant an injunction, a court must look at the specific facts and circumstances of the case." *Mike McGarry & Sons, Inc. v. Gross,* Cuyahoga App. No. 86603, 2006-Ohio-1759, 2006 WL 895094, ¶ 9. "Each element must be established by clear and convincing evidence. * * * Clear and convincing evidence is the measure or degree of proof more than a mere 'preponderance of the evidence,' but less than 'beyond a reasonable doubt' required in criminal cases, and which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Id. at ¶ 11.

{¶ 18} In granting the preliminary injunction, the trial court found that Armor Metal was likely to succeed on its claim that the Freemans were violating the terms of their restrictive covenants. After reviewing the record, however, we conclude that Armor Metal did not present clear and convincing evidence that the Freemans were bound by the restrictive covenants found in the APA, and the trial court abused its discretion in finding otherwise.

## B. APA and Batavia Lease

{¶ 19} According to the APA, Section 5.1, the Freemans and Victory Delaware agreed to several restrictive covenants, including noncompetition, non-solicitation, confidentiality, and noninterference with relationships. According to the APA's glossary of terms, the parties agreed to a term of five years for all the restrictive covenants except the confidentiality clause, which did not have an expiration date. The Freemans argued that the restrictive covenants were not enforceable against them once Victory Delaware breached the Batavia lease and Armor Metal purchased the intellectual property without assuming any reciprocal obligations. The trial court, however, found that Victory Delaware's breach of the Batavia lease did not relieve the Freemans of their obligations, and the assignment to Armor Metal was proper. However, neither of the trial court's findings is supported by clear and convincing evidence.

{¶ 20} According to Section 1.3 of the APA, the Batavia lease was listed as a document to be brought to the closing. The APA also states that the parties "will execute" the items included on Schedule 1.3(i), including the Batavia lease. The Batavia lease was also attached to the APA as Exhibit C. While the trial court stated that the parties' duties were extinguished once closing occurred and the Batavia lease was delivered and executed, this analysis is unreasonable. Instead, Section 7.10 of the APA states, "[T]his Agreement and all of the Schedules and Exhibits attached to the Agreement (which shall be deemed incorporated in the Agreement and made a part hereof) set forth the entire understanding of the parties with respect to the subject matter hereof and may be modified only by

instruments signed by all of the parties hereto." The unambiguous language of the APA establishes that the Batavia lease was integrated into the APA fully and was not meant to be deemed an irrelevant term of the APA once closing occurred.

{¶ 21} Even if ambiguity existed regarding the degree to which the Batavia lease is incorporated into the APA or what role it played past closing, the parties' intent clearly establishes that the Freemans and Victory Delaware intended for the lease to be an ongoing part of the APA. During the negotiation period between Victory Delaware and the Freemans specific to the sale of VIP, the parties understood that the Batavia lease was an ongoing consideration beyond closing. For example, the Freemans' attorney sent an e-mail to the bank that held part of the mortgage on the plant and stated that as part of the APA, Victory Delaware "would continue to lease space from the Freeman's other entity, KYCAJO, Ltd.," and a later e-mail stated that "the Lease is a key document for the Freemans." Further, in its letter of intent[1] to purchase VIP, Victory Delaware stated, "[W]e understand that, through an affiliate of the Company owned by you, you are in the process of acquiring and building out a new facility to house the Company's operations (the 'New Facility'). The Purchase Price assumes that [Victory Delaware] will enter into a lease at a fair market rate mutually agreed upon to Closing for the New Facility."

{¶ 22} Testimony adduced at the hearing reiterates the parties' intent regarding the Batavia lease. During Bonnie's testimony, she stated that she considered the Batavia lease and the APA "all one package" and that they "all had to agree on the lease terms in order for the deal to be done." On cross-examination, Dale was asked whether the purchase price was sufficient consideration to make the APA's restrictive covenants enforceable, and he responded "along with the obligations, yes." Dale went on to state, "[T]he lease was one of the obligations under—the Asset Purchase Agreement that pretty much drove the whole deal. Without the lease there would have been no deal. In fact, [Victory Delaware], during the negotiations, did not want to accept the term that we wanted on the lease, and we decided the deal was off. They came back and—and wanted then to accept our terms." Dale also stated that he understood the APA to include all schedules and exhibits and that he considered the Batavia lease and APA to be one agreement. Dale testified that "the whole sum of all the documents that sold this company included this lease" and there would "absolutely not" have been a deal had Victory Delaware not agreed to lease the plant. Dale also stated, "[T]he

---

1. According to the terms of the letter of intent, Victory Delaware noted that the letter was "being given for the purpose of initiating good faith negotiations among the parties that may culminate in the execution of definitive legal documents to consummate the transaction described herein." While this court recognizes the nonbinding nature of the letter, it is nonetheless a useful indication of the parties' understanding during negotiations regarding Victory Delaware's willingness to rent the plant.

purchase price meant nothing if we didn't have the lease covered." The evidence and testimony clearly demonstrate that the Freemans and Victory Delaware understood the Batavia lease to be an integral part of the APA and an ongoing obligation that survived closing.

## C. Divisibility

{¶ 23} The trial court assumed that even if the Batavia lease had been made an ongoing part of the APA, the terms are divisible so that Victory Delaware's breach did not excuse the Freemans' performance. "Whether a contract of sale is entire or divisible depends generally upon the intention of the parties, and this must be ascertained by the ordinary rules of construction, considering not only the language of the contract, but also, in cases of uncertainty, the subject-matter, the situation of the parties, and circumstances surrounding the transaction, and the construction placed upon the contract by the parties themselves. If the part to be performed by one party consists of several distinct and separate items, and the price is apportioned to each item, payable at the time of delivery, the contract will generally be held severable. * * * The primary criteria in determining whether a contract is entire or divisible is the intention of the parties as determined by a fair consideration of the terms and provision of the contract itself, by the subject matter to which it has reference, and by the circumstances of the particular transaction giving rise to the question. A factor in determining whether a contract is entire or severable is whether the parties reached an agreement regarding the various items as a whole or whether the agreement was reached by regarding each item as a unit." *Nayles v. Best Mfg. & Supply, Inc.* (Jan. 24, 1996), Montgomery App. No. CA 15026, 1996 WL 27832, *4.

{¶ 24} Although the trial court determined that the terms were divisible because the APA and the Batavia lease had separate consideration, Section 5.1 of the APA did not expressly reference the Batavia lease, and KYCAJO signed the Batavia lease instead of the Freemans, the trial court did not take into consideration the parties' intent regarding the divisibility of the APA and lease. According to the legal standard above, the divisibility of the contract depends upon the intent of the parties. While the contract's wording is a factor to consider, the primary consideration is the intention of the parties as determined by the wording and the subject matter to which it has reference and by the circumstances of the particular transaction giving rise to the question.

{¶ 25} As discussed above, the evidence demonstrates that Victory Delaware understood during the negotiation process that it had to rent the plant in order to purchase VIP, and the Freemans' testimony demonstrates that they would not have entered into the APA absent a long-term lease. Therefore, it is clear that

the parties reached the agreement to sell/purchase VIP and to execute the Batavia lease as a whole transaction. Further, the evidence is clear that Victory Delaware understood KYCAJO and the Freemans to be the same entity, as the Freemans' real-estate holding company is mentioned in Victory Delaware's letter of intent, and KYCAJO is defined in the APA's glossary of terms.

{¶ 26} In cases of uncertainty, the subject matter, the situation of the parties, circumstances surrounding the transaction, and the construction placed upon the contract by the parties themselves become important factors in determining divisibility. The APA's wording is not definite regarding whether the restrictive covenants are divisible from the Batavia lease. For example, Section 5.1 of the APA states that "to more effectively protect the value of the Business, and to induce the Purchaser to consummate the transactions contemplated hereby, each Selling Party covenants and agrees" to the terms of the noncompete clause. However, the use of the word "transactions" lends ambiguity to the section, requiring increased reliance on the parties' intent. Instead of denoting the sale/purchase of VIP as *the single transaction* necessary to consummate the noncompete clause, the APA's use of the word "transactions" implicitly includes the Batavia lease. The Freemans' testimony supports the idea that both the purchase price and the Batavia lease were necessary to consummate the noncompete clause.

{¶ 27} As stated above, Bonnie considered the Batavia lease and the APA "all one package," demonstrating that the terms contained in each were not divisible. Dale also testified that "the lease was one of the obligations under—the Asset Purchase Agreement that pretty much drove the whole deal," and that "the whole sum of all the documents that sold this company included this lease."

{¶ 28} Based on the circumstances of the particular transaction giving rise to the question, we conclude that the terms of the APA and Batavia lease are not divisible. It is unreasonable to review the negotiation period between Victory Delaware and the Freemans as creating anything but reciprocal burdens. The APA and Batavia lease were executed on the same day and incorporated fully by reference and intent. The Freemans agreed to sell their business only once Victory Delaware agreed to commit itself to a long-term lease, thereby protecting the personal guarantees of over $5 million that the Freemans made on the plant. Alternatively, Victory Delaware agreed to purchase VIP and obligate itself for a 12–year lease at approximately $50,000 a month because it received the Freemans' covenants not to compete, interfere, or share confidential information regarding the business.

{¶ 29} The trial court, in determining that the terms were divisible, stated that Victory Delaware would not have been permitted to breach the Batavia lease had the Freemans reneged on their covenants. However, this court is unwilling to

make the same absolute statement. Had the Freemans pursued another business, pilfered Victory Delaware's employees, solicited Victory Delaware's customers, and shared confidential information to Victory Delaware's detriment, Victory Delaware could have argued that the terms of the APA were breached, thereby excusing its performance on the Batavia lease. Just as the Freemans state that they entered into the APA once Victory Delaware entered the lease, Victory Delaware was induced to enter the lease because of the restrictive covenants that protected the value of its business endeavor.

{¶ 30} We also note that the construction placed upon the contract by the parties themselves demonstrates that the terms were not divisible. When the Freemans left Victory Delaware after a year of employment, Victory Delaware was still leasing the plant. Dale accepted employment with a generator distribution company, and Bonnie stayed at home to raise the Freemans' youngest daughter. During the time that Victory Delaware abided by the terms of the lease, the Freemans did not attempt to open a competing business or try to break their covenants. Only after Victory Delaware breached and stopped paying rent on the plant did the Freemans feel breaking the covenants was permissible in order to start a business to use the plant. The Freemans both testified that they construed the APA and Batavia lease as a single document and that Victory Delaware's breach of the Batavia lease was a breach of the APA, thereby releasing them from the restrictive covenants.

### D. Materiality of Breach

{¶ 31} The trial court reasoned that even if the terms of the Batavia lease were incorporated into the APA and were not divisible, Victory Delaware's breach of the Batavia lease was not material. "On the issue of materiality, Ohio courts have applied the Restatement (Second) of Contracts." *Ohio Edn. Assn. v. Lopez*, Franklin App. No. 09–AP–1165, 2010-Ohio-5079, 2010 WL 4102948, ¶ 14. The Restatement (Second) of Contracts (1981), Section 241, states the following: "In determining whether a failure to render or to offer performance is material, the following circumstances are significant: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." According to the notes for Section 241, "this Section therefore states circumstances, not rules, which are to be considered in determining whether a particular failure is material." "More

simply, a material breach occurs when a party violates a term essential to the purpose of the agreement." *Ohio Edn. Assn.* at ¶ 15.

{¶ 32} Regarding the first factor, the trial court noted that the Freemans would not be deprived of the benefit they reasonably expected because Victory Delaware paid the entire purchase price for VIP, the only benefit reasonably expected under the APA. However, given the degree to which the Batavia lease was incorporated into the APA and the fact that the Freemans agreed to the covenants because Victory Delaware agreed to lease the plant, the Freemans were denied the benefit of both the rental payments and having their personal guarantees protected. The evidence clearly indicates that Victory Delaware entered into a 12–year lease, at approximately $50,000 a month. At the time of its breach, Victory Delaware left $5,282,755.06 outstanding on the lease—a benefit amount reasonably expected by the Freemans. Further, without a long-term tenant, the Freemans were left unprotected on the personal guarantees they executed in order to purchase and develop the plant.

{¶ 33} Regarding the second factor, the trial court concluded that the Freemans are able to proceed under the Batavia lease in order to collect any compensatory damages to which they are entitled. While that statement is likely accurate as it relates to the rental payments, the trial court foreclosed the Freemans from the possibility of protecting their personal guarantees by seeking redress under the APA or using the plant to start a business in the field in which they are highly experienced. Instead, the Freemans cannot be adequately compensated for the part of that benefit of which they will be deprived, mainly the personal loss they face, unless they are freed from the restrictive covenants and operate a business in the plant.

{¶ 34} The third and fourth factors are not applicable to the case at bar. Regarding the final factor, Victory Delaware acted in good faith when it transferred its assets to the trustee in order to protect its creditors. However, the factors weigh in favor of finding Victory Delaware's breach material, especially when the Batavia lease was so essential to the purpose of the APA and what the transfer of assets hinged on. It is unreasonable to conclude that the Freemans would sell VIP and subject themselves to restrictive covenants without expecting Victory Delaware to fulfill its obligation under the APA. Similarly, it is unreasonable to conclude that Victory Delaware would purchase VIP and agree to obligate itself on a long-term lease without first securing the Freemans' covenants. In conclusion, the Batavia lease was an essential term to the purpose of the APA, the breach of which was material.

### E. Assignability Clauses

{¶ 35} Even assuming that the trial court did not abuse its discretion in finding that Armor Metal would succeed on the merits specific to the restrictive

covenants, Armor Metal did not present clear and convincing evidence that the covenants were assignable to an entity that did not also take on Victory Delaware's obligations. According to Section 7.9 of the APA, "[T]his Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but will not be assignable or delegable by any party without the prior written consent of the other party, *provided, however,* that the Purchaser shall be allowed to assign its rights and benefits hereto to (a) an Affiliate so long as the Affiliate assumes the Purchaser's obligations hereunder, as applicable, (b) in connection with a sale of the Purchaser's business, whether by sale of assets, sale of equity interests, merger, consolidation or otherwise, so long as the assignee assumes the Purchaser's obligations hereunder, as applicable, and (c) to the Purchaser's lenders as collateral for security purposes." (Emphasis sic.) Despite the uncontroverted fact that Armor Metal did not assume Victory Delaware's obligations under the APA, the trial court found that the assignment was nevertheless valid because the APA clause was superseded by the Freemans' termination agreements.

{¶ 36} According to the termination agreements, "neither party may assign any of its or his rights or obligations hereunder without the written consent of the other, except that the Company may assign this Agreement in connection with a merger, a sale of all of its equity or a sale of all or substantially all of its assets. Except as otherwise expressly provided herein, all covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not." While the assignment provision within the termination agreement does not require an acquiring party to assume the obligations, the termination agreement clause does not supersede the APA assignment clause.

{¶ 37} According to Section 7(h) of the termination agreement, "this Agreement represents the entire agreement and understanding *concerning Freeman's employment with and separation from,* the Company, and supersedes and replaces any and all prior agreements, understandings, discussions, proposals, or negotiations (whether written or oral) between Freeman and the Company on the matters addressed herein." (Emphasis added.)

{¶ 38} The termination-agreement clause states clearly, and multiple times throughout the agreement, that it addresses only issues concerning the Freemans' employment with and separation from Victory Delaware. The termination agreement, while it certainly governed the issues dealing with the Freemans' leaving Victory Delaware's employ, did not supersede the APA regarding the sale of VIP or what transactions were incorporated into the APA as part of the asset purchase. The termination agreement could not alter the assignability clause

within the APA regarding obligations that Victory Delaware created for itself that were specific to its purchase of VIP, mainly its obligation to lease the plant. Instead, the termination agreement dealt exclusively with employment and separation issues, not the purchase of VIP a year prior to Bonnie's and Dale's terminations from the company.

{¶ 39} More specifically, the termination agreement references the restrictive covenants from Section 5.1 of the APA and acknowledged those covenants as pre-existing obligations for the Freemans. The covenants, pre-existing because they were executed within the APA, were not created as a result of the termination agreement, but instead were a part of the APA and contemporaneously signed employment contracts. Within the termination agreement itself, however, Victory Delaware agreed to a "Non–Solicitation Carve–Out" that allowed the Freemans to hire their children. This change to the nonsolicitation clause was the only right or obligation created by and upon the Freemans' termination from Victory Delaware that differed from those listed in Section 5.1. In fact, Section 2 of the termination agreement states that "in consideration for the Non–Solicitation Carve–Out," the Freemans agreed to release their right to sue Victory Delaware for any issue arising out of their termination. Other than the carve-out exception, the parties did not even reiterate the scope or language of the covenants within the termination agreement, and instead, referenced the APA as controlling.

{¶ 40} Further, we note that the termination agreement contains a nonadmission/inadmissibility clause that states that "this Agreement is entered into solely to resolve fully all matters related to or arising out of Freeman's employment with, and separation from, the Company. Neither this Agreement nor testimony regarding its execution or implementation may be admitted or used as evidence in a subsequent proceeding of any kind, except one alleging a breach of this Agreement." It is therefore unreasonable to rely on a clause within the termination agreement regarding the assignability of Victory Delaware's obligations when those obligations were not connected with Dale's and Bonnie's terminations in any way.

{¶ 41} However, even if we were to assume arguendo that the termination agreement somehow superseded the APA, Armor Metal's separate purchases of intellectual property and a portion of Victory Delaware's tangible assets does not constitute "*a sale* of all of [Victory Delaware's] equity or *a sale* of all or substantially all of its assets" as required in the termination agreement. (Emphasis added.) The fact that the contract expressly states that Victory Delaware could assign its rights or obligations under the termination agreement upon a sale of its equity or all its assets creates unambiguous language that a single transaction to a single party was contemplated. That determination comports

with the purpose of the covenants in the first place, as expressed in Sections 5.1(a) and (g) of the APA, to "protect the value of the Business."

{¶ 42} Once Victory Delaware was disbanded and sold in lots, Armor Metal's $30,000 payment for the intellectual property did not satisfy the condition set forth in the termination agreement permitting assignment upon a sale of Victory Delaware. The restrictive covenants were not only invalidated, but they were also rendered unassignable according to the APA or termination agreement once Victory Delaware disbanded and its parts were disseminated at auction.

### III. Remaining Assignments of Error

{¶ 43} The remaining assignments of error are made moot by our decision:

{¶ 44} Assignment of Error No. 1:

{¶ 45} "The trial court erred by misinterpreting the applicable confidentiality clause."

{¶ 46} Assignment of Error No. 2:

{¶ 47} "The trial court erred in declaring that there was evidence of misappropriation and trade secrets."

{¶ 48} Assignment of Error No. 4:

{¶ 49} "The trial court erred in concluding that the covenants are enforceable under *Raimonde*."

{¶ 50} Assignment of Error No. 5:

{¶ 51} "The trial court erred in enforcing §§ 5.1(b) and (d) of the APA."

{¶ 52} Assignment of Error No. 6:

{¶ 53} "The court erred in awarding injunctive relief on the intentional interference claims."

{¶ 54} Assignment of Error No. 7:

{¶ 55} "The court erred regarding third parties and the public."

### IV. Conclusion

{¶ 56} Normally, a party's inability to show a substantial likelihood that it would prevail on the merits of its claim is not the only factor to be taken into consideration under a preliminary-injunction standard. However, in the current case, the remaining three factors are made inapplicable because the Freemans are not bound by the restrictive covenants. Specifically, without a valid contract, or the right to hold the Freemans to covenants, Armor Metal cannot show that it will suffer irreparable injury if the injunction is not granted. Further, without a valid contract binding the Freemans to Armor Metal, we need not consider

whether third parties will be affected or whether the public interest will be served by an injunction.

{¶ 57} We also note that our decision affects the counterclaim defendants. The trial court specifically found that the counterclaim defendants were not bound by any employment contracts or restrictive covenants they may have signed with Victory Delaware, because those contracts and covenants were not assignable. The court, nonetheless, enjoined the counterclaim defendants from misappropriating trade secrets, tortiously interfering with Armor Metal's relationships, and manufacturing and selling products using Armor Metal's designs, processes, and techniques. Without being bound by restrictive covenants or contractual obligations, the counterclaim defendants should not have been enjoined. Even if the trial court enjoined the counterclaim defendants based on its injunction against the Freemans from hiring the counterclaim defendants, the invalidation of the injunction also terminates any injunction against the counterclaim defendants as well.

{¶ 58} Because the Freemans and counterclaim defendants are not bound, the trial court's decision granting Armor Metal's request for a preliminary injunction was an abuse of discretion. Having found the Freemans' and counterclaim defendants' consolidated argument meritorious, we sustain their third assignment of error. The trial court's decision is therefore reversed, and the judgment granting a preliminary injunction is vacated.

Judgment reversed and vacated.

POWELL, P.J., and HENDRICKSON, J., concur.