[Cite as *Gimex Properties Corp., Inc. v. Reed*, 2022-Ohio-4771.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| Gimex Properties Corp., Inc., d/b/a T.A.C. | Court of Appeals No. L-22-1049 |
| Appellee | Trial Court No. CI0202101519 |
| v. | |
| Ashley Reed, et al. | **DECISION AND JUDGMENT** |
| Appellants | Decided: December 29, 2022 |

* * * * *

Sarah K. Skow and Jennifer A. McHugh, for appellee.

Matthew A. Leibert and David A. Bressman, for appellants.

* * * * *

**ZMUDA, J.**

## I.      Introduction

{¶ 1} Appellants, Thomas and Ashley Reed, appeal the judgment of the Lucas County Court of Common Pleas, granting judgment in favor of appellee, Gimex Properties Corp., Inc., on its claims for breach of contract and misappropriation of trade secrets.  Finding no error in the proceedings below, we affirm.

## A. Facts and Procedural Background

{¶ 2} Appellee is a corporation headquartered in Toledo, Ohio, which issues licenses to certain franchisees to operate automotive service shops known as Tuffy Auto Service Centers. In exchange for its wide-ranging business support it provides, appellee receives royalty payments from its franchisees. Appellants were previously among appellee's franchisees, and they were licensed to operate Tuffy Auto Service Centers in the Orlando, Florida area.

{¶ 3} In early 2021, appellants were involved in an irreconcilable dispute with their business partners, which led to the termination of their relationship with appellee. Thereafter, appellants began working as employees of another automotive service shop in the Orlando area, Fournier's Performance Automotive ("Fournier's").

{¶ 4} On March 11, 2021, upon learning of appellants' subsequent employment with a business it considered a competitor, appellee filed its complaint in this action. In the complaint, appellee alleged that appellants' affiliation with Fournier's constituted a breach of the terms of the parties' license agreement, namely the non-competition and confidentiality provisions contained therein.[1] Thus, appellee asserted claims for breach of contract and "trade secret misappropriation/inevitable discovery," and sought a preliminary injunction, "to be made permanent at trial," enjoining appellants from

---

[1] A copy of the license agreement was attached to appellee's complaint.

2.

operating Fournier's or engaging in any other competitive activity for a period of two years.

{¶ 5} On June 2, 2021, appellants filed their answer to appellee's complaint. Throughout the proceedings before the trial court, appellants proceeded pro se. Following pretrial discovery and motion practice, appellants amended their answer on December 8, 2021. In their amended answer, appellants admitted that they were signatories to the license agreement attached to appellee's complaint, and thus obligated to refrain from competing with appellee within a geographical area of five miles of a Tuffy Auto Service Center for a period of two years after the expiration or termination of the license.

{¶ 6} Nonetheless, appellants asserted that their affiliation with Fournier's was not competitive in nature, because Fournier's "specializes in Classic and Performance Vehicles," and does not "directly compete for work against [appellee]." Moreover, appellants asserted that appellee was not entitled to the relief it requested because appellee suffered no irreparable harm on account of their involvement with Fournier's. Appellants denied having any confidential information or trade secrets, and insisted that the knowledge they possessed concerning operation of an automotive service business was the product of decades of prior industry experience, not their association with appellee.

3.

{¶ 7} On December 20, 2021, the matter proceeded to a trial before the bench.  At the outset of the trial, appellee made several motions in limine.  In one such motion, appellee sought an order from the court precluding appellants from calling any witnesses or taking the stand in their own defense based upon appellants' failure to file a witness list in accordance with the trial court's scheduling orders.  Upon consideration, the trial court denied appellee's request to preclude appellants from testifying, and stated: "So I will allow [appellants] to testify as on cross for the defense and if they would like to also – you can't ask yourself a question necessarily.  It's kind of awkward to do that.  But if you'd like to present any testimony you think would help on your side, I'll allow that as well."

{¶ 8} The trial then proceeded to appellee's case-in-chief.  As its first witness, appellee called its director of franchise development, Eric Schmitt.  As director of franchise development, Schmitt is responsible for creating the license agreements appellee uses with its franchisees.  According to Schmitt, these agreements specify the responsibilities and obligations of franchisees as well as the support appellee provides to its franchisees.  Schmitt stated that appellee has continuously refined its business model and practices since it was formed over 50 years ago, and thus "there's just a lot that goes into this business model.  There's operations manuals, there's marketing manuals, it's a really a how-to kind of turnkey business."

4.

{¶ 9} When asked to describe appellee's business model more specifically, Schmitt responded that appellee has developed proprietary materials that are provided to franchisees in order to facilitate the sale of automotive services. Further, Schmitt explained that appellee is engaged in the provision of automotive services involving "[e]verything from exhaust to brakes to mufflers, oil change, * * * anything to do with fixing a car is what we are involved in."

{¶ 10} Later in his direct examination, Schmitt detailed appellee's franchising process. First, the prospective franchisee must complete an application. According to Schmitt, appellants and one of their business partners completed such an application in this case. Thereafter, appellee provides the prospective franchisee with a franchise disclosure document for their review. The prospective franchisee is then "invited to Toledo for a discover day and that's a day that they meet with the current management team." Afterwards, appellee's franchise review committee convenes and decides whether to award the franchise. If the prospective franchisee is awarded a franchise, appellee provides a license agreement for execution. Once the agreement is executed, the franchise vetting process is complete and appellee considers the prospective franchisee as an actual franchisee. Here, appellant executed such a license agreement, a copy of which was admitted into the record as Plaintiff's Exhibit H.

{¶ 11} At the outset of the franchise relationship, appellee invites the franchisee to Toledo for "new dealer training," which occurs over a period of eight to ten days and

5.

"consists primarily of business development and [training on] how to run a business." At this time, the franchisee is provided with proprietary information such as operations manuals, payment plans, marketing techniques, training on financial documents such as profit/loss statements and the like, disclosure of vendors used by appellee and the agreements appellee has with such vendors, customer lists, information about appellee's pricing margins and labor costs. Schmitt testified that appellants attended new dealer training at which they received this proprietary information. A certificate of completion was admitted into the record memorializing appellants' completion of new dealer training on September 19, 2018.

{¶ 12} Once the franchise is up and running, franchisees are privy to continuing education from appellee through Tuffy University and annual dealer meetings that include breakout sessions where dealers discuss improving appellee's brand and business operations.

{¶ 13} Schmitt testified that the business practices and credibility appellee has developed over several decades has enabled it to be competitive in the automotive services industry. He indicated that it would be "very difficult today" to start an independent automotive repair shop given the competitive market dynamics and the fact that the "automotive business is very difficult."

{¶ 14} Turning to the facts of this case, Schmitt testified that he first met appellants when they arrived with a business partner, Nate Trombetti, at appellee's

6.

Toledo headquarters for discover day on July 6, 2018.  At the time, appellants were interested in purchasing the Tuffy's automotive service shop in Sanford, Florida.  Eventually, a franchise was awarded and a limited liability company, Sanford Tuff, LLC, was formed to hold the franchise.  The members of Sanford Tuff, LLC were TAR Automotive, LLC (owned by appellants) and JNT Investments, LLC (owned by Ernest C. Aulls, III).  The ownership interest in Sanford Tuff, LLC was split evenly between TAR Automotive, LLC and JNT Investments, LLC.

{¶ 15} The license agreement, which was executed by appellants in their individual capacities, and by Thomas in his capacity as manager of Sanford Tuff, LLC, became effective on October 24, 2018.  In its introductory section, the agreement references a franchise system, referred to throughout the agreement as the "Tuffy System," and states:

> Licensor licenses a system for operation of an automotive repair business that sells, installs and services automotive exhaust systems, brakes, front end, steering and suspension, alignment, air conditioning, engine diagnostics, batteries, tires and other automotive products and services.  The distinguishing characteristics of the system include the Licensor's trademarks and logos, training, operation procedures, promotional techniques and materials, location analysis, building design and layout, record keeping and reporting.

7.

**{¶ 16}** Schmitt reviewed certain portions of the license agreement and provided explanation of its terms during the trial. One such section was labeled "Article Twelve – Confidentiality and Non-Competition." In it, the agreement indicates that appellants would have access to certain "proprietary and/or confidential information relating to developing and operating a Center." Such confidential information was identified as including, without limitation:

(a) Training manuals, policy manuals, operations manuals, operating methods, sales promotion aids, business forms, products and services, installation and service procedures, accounting procedures, marketing reports, supplier discounts and inventory systems, techniques, processes, policies, procedures, systems and data;

(b) Knowledge and experience relating to Centers;

(c) Advertising, marketing techniques and advertising programs used in developing and operating Centers;

(d) All information regarding the identities and business transactions of customers and suppliers;

(e) Computer software and similar technology that has been or may be developed by or for Licensor or its agents, which is proprietary to Licensor, including, without limitation, digital passwords and

8.

identifications and any source code of, and data, reports, and other printer materials generated by, the software or similar technology;

(f) Knowledge of the operating results and financial performance of Centers;

(g) Other aspects of the Tuffy System now or later revealed to Licensee under this Agreement and all changes and enhancements in the Tuffy System, even if developed by Licensee.

(h) Other property that Licensor describes as being Confidential Information or trade secrets of the Tuffy System.

**{¶ 17}** The agreement went on to impose upon appellants an obligation to keep this information confidential and to refrain from using the information in any business or capacity other than in the franchise "for as long as the Confidential Information is not generally known in the industry." Moreover, Article Twelve of the agreement included a non-compete clause, which provided in pertinent part:

**12.5 Covenant Not to Compete After Term.**

On the termination (including termination on transfer), expiration or non-renewal of this Agreement, Licensee, its shareholders, officers, directors, partners, owners and investors, must not, for a period of two years commencing on the later of the effective date of termination, expiration or non-renewal, or the date of any Court order enforcing this

9.

provision if necessary, have an interest, directly or indirectly, as an owner (except ownership of no more than 1% of a publicly traded entity), partner, director, officer, manager, employee, consultant, representative or agent, or in any other capacity, or engage in any other capacity in any Competing Business or in any business * * * within any "Geographic Areas" (defined in Section 12.7).

* * *

**12.6 Other Restrictions on Activities.**

Licensee, its shareholders, officers, directors, partners, owners and investors must not, during the term of this Agreement and for a period of two years after the expiration or termination * * * of this Agreement: (a) divert or attempt to divert any business or customer of the Franchise Business or any other Center to any Competing Business by direct or indirect inducements or otherwise (whether or not Licensee has a direct or indirect interest in that business or person); (b) employ or seek to employ any person who was, at the time, employed by Licensor or its affiliates or by another Center, or directly or indirectly induce any person to leave their employment with Licensor or its affiliates or with another Center; * * *.

10.

**12.7 Definition of Competing Business and Geographic Areas.**

For purposes of this Agreement, a "Competing Business" includes any business that is the same or similar to a Center, including but not limited to a business that sells installs and services automotive exhaust systems, brakes, front end, steering, suspension, alignment, air conditioning, engine diagnostics, batteries, or tires at retail or other products or services that may be offered by Centers now or in the future. For purposes of this Agreement, the "Geographic Areas" include the area within five miles of the Licensed Location and the areas within five miles of any other Centers existing at the time the Licensee or its shareholders, officers, directors, partners, owners or investors begins to operate the Competing Business.

**12.8 Acknowledgements and Agreements Relating to Restrictions on Competition.**

Licensee agrees that the length of the term and the geographical restrictions contained in this Article are fair and reasonable. The parties have attempted to limit Licensee's right to compete only to the extent necessary to protect the reasonable competitive business interests of Licensor and its franchisees. If the above restrictions or any part of these restrictions are invalid, this Article will be considered as imposing the

11.

maximum restrictions allowed under the applicable state law in place of the invalid restriction or part of the restriction.

{¶ 18} When asked to explain the purpose behind including the foregoing competition provisions in the agreement, Schmitt testified that the provisions were a necessary safeguard for appellee considering the resources it provides to its franchisees. Schmitt explained that appellee "provide[s] the playbook" of resources and training to enable the franchisee to take advantage of a "turnkey operation." Schmitt agreed that appellee's enforcement of the covenants not to compete contained in its license agreements was necessary to demonstrate appellee's commitment to prevent unfair competition from a former franchisee toward existing franchisees.

{¶ 19} Next, Schmitt referenced Article 17.2 of the agreement, which provides for injunctive relief to appellee in the event its franchisees engage in competitive practices that violate the provisions of Article 12 of the agreement. Schmitt explained that injunctive relief is an important component of the license agreement because monetary damages would be difficult to measure in cases involving unfair competition.

{¶ 20} After reviewing the terms of the license agreement, Schmitt turned his attention to two letters that appellee sent to appellants upon learning of appellants' involvement with Fornier's Performance Automotive, a competing automotive service

12.

business located within five miles of a Tuffy franchise in Orlando, Florida.[2]  In the first letter, dated January 26, 2021, appellee took the position that appellants' involvement with Fornier's constituted a breach of the non-competition and confidentiality provisions of the parties' license agreement, and threatened to pursue legal action against appellants if they refused to cease such involvement.  Schmitt stated that appellants did not respond to this letter.  Consequently, appellee followed up with another letter dated February 3, 2021, again demanding that appellants refrain from any involvement in the operation of Fornier's Performance Automotive.

{¶ 21} In response to appellee's letters, appellants sent an email to appellee's corporate counsel on February 4, 2021, informing him that they "are not doing business at [Fornier's Performance Automotive].  We were interested in purchasing that business and have reconsidered."  In another email sent four days later, Thomas indicated that the owner of Fornier's Performance Automotive was "in poor health and unable to work on the classic cars he is currently restoring.  He has agreed to teach me so I'm taking the opportunity to obtain his knowledge in classic car restoration while applying for employment elsewhere.  I am not an employee nor am I pursuing a purchase of this store."

---

[2] According to maps admitted into the record in this case by appellee, Fornier's Performance Automotive is located 3.24 miles from the nearest Tuffy franchise "as the crow flies," and 4.8 miles in terms of driving distance.

13.

{¶ 22} Schmitt testified that Fornier's Performance Automotive's focus on classic vehicles is inconsequential to whether it is a competing business under the terms of the parties' license agreement, because there is no distinction between working on classic vehicles and any other vehicles. He stated that Tuffy works on all types of vehicles, including performance and classic cars.

{¶ 23} During his testimony, Schmitt stated that the automotive repair service industry was experiencing a shortage of good mechanics and employees amid the Covid-19 pandemic. Given the market conditions, several Tuffy franchisees reached out to appellee to voice their concerns about appellants' involvement with Fornier's Performance Automotive and ask appellee to enforce its non-competition rights.

{¶ 24} Schmitt explained that such enforcement is important in this case because failure to insist upon adherence to the non-competition and confidentiality provisions in the license agreement "would show the franchisees in the system that any article or provision could probably be challenged." Furthermore, Schmitt surmised that other franchisees would become "very upset" with appellee if it did not seek to prevent appellants from having any involvement with Fornier's Performance Automotive. This could also have a chilling effect on appellee's ability to attract new franchisees according to Schmitt.

14.

**{¶ 25}** On cross examination, Schmitt was asked to identify the extent of appellee's damages attributable to appellants' involvement with Fornier's Performance Automotive. He responded, "[t]here would be no way for me to qualify that."

**{¶ 26}** Appellee next called Scott Linde, appellee's district manager who oversees all corporate-owned and franchised Tuffy automotive service centers in the state of Florida.

**{¶ 27}** Linde testified as to the support and training appellee offers to its franchisees, and also explained appellee's "Tuffy Way" approach for providing services such as oil changes in a manner that is unique in the industry. Additionally, Linde testified that appellee services all types of vehicles, including classic cars and performance vehicles.

**{¶ 28}** In his capacity as district manager, Linde interacted with appellants during the period in which they owned and operated the Tuffy franchise located in Sanford, Florida. When he first met appellants, Thomas was a manager of the Sanford location. At the time, the previous owner of the franchise was having financial difficulties and Thomas expressed a desire to purchase the franchise. Eventually, appellants secured the necessary financing and purchased two franchise locations: the Sanford location as well as the Oviedo, Florida, location.

**{¶ 29}** Linde testified that appellee provided appellants with proprietary information, business development assistance, and training that was confidential in

nature. He went on to indicate that appellee also shares its independent market research information with its franchisees. While he acknowledged that Thomas was already a "master technician" when he became a franchisee, Linde stated that appellee provided Thomas with updated training to address "new developments" in the area of automotive service, and also trained appellants on management and customer service techniques to assist them with operating their automotive service business.

{¶ 30} Turning his attention to the events that transpired around the time of appellants' termination of their relationship with appellee, Linde authenticated a brief text message exchange he had with Thomas. On November 16, 2020, Linde informed Thomas that another Florida Tuffy's franchise was looking for a master technician and asked Thomas whether one of his former master technicians, Russ, was looking for a job. Nearly one month later, on December 15, 2020, Thomas responded to Linde's message and told Linde that he "had a job waiting for [Russ] and all the rest of my employees." Although Thomas provided no further explanation to Linde concerning where he planned to take Russ and the rest of his employees, Linde testified that Russ eventually began working with Thomas at Fournier's. By the time of trial, however, Russ had returned to appellee's employ at another Tuffy franchise location in central Florida.

{¶ 31} After appellants terminated their relationship with appellee, Linde conducted an internet search to ascertain whether appellants were competing with appellee. He discovered that appellants had formed a limited liability company, Reed

16.

Performance Automotive LLC, which was registered with the Florida Secretary of State. According to it articles of organization, the limited liability company's principal office and mailing address was the address at which Fournier's is located. Ashley is the registered agent, and appellants' personal address is listed in the articles of organization. Linde authenticated a map he created in Mapquest that showed a driving distance of 31.4 miles from appellants' address to Fournier's.

{¶ 32} Upon discovering appellants' registration of the aforementioned limited liability company, Linde decided to drive by the address listed on the registration. When he did so, he "saw a busy repair shop that works on cars" at that site. Despite Fournier's emphasis on performance vehicles, Linde testified that he did not recall seeing any performance vehicles in the shop when he drove by. Linde observed "one or two classic cars," but mostly "late model vehicles like every shop works on." Linde visited Fournier's on two additional occasions in 2021. While driving past the location, Linde photographed the building and its parking lot. The photographs taken by Linde were authenticated and admitted into the record at trial. Most of the vehicles depicted in those photographs (including one vehicle that was parked inside the garage and elevated on a car lift) are late model vehicles consistent with Linde's prior testimony.

{¶ 33} Given his observation of the types of vehicles serviced at Fournier's, Linde concluded that Fournier's was one of appellee's competitors. At trial, he explained that Fournier's "work[s] on the same vehicles. Same automotive repair. It's not like it's a

17.

body shop.  * * * The same oil changes, brakes and they're in the circle of the way we market, so the circles overlap.  So yes, they are a [competitor]."  As additional support for his conclusion that Fournier's serviced the same type of vehicles serviced by appellee's franchisees, Linde recounted a customer with a late model Honda CR-V who returned to a Tuffy franchise, the "Semoran store," after having brakes serviced at Fournier's.  On cross examination, Linde acknowledged that he was unaware whether this customer was actually solicited by appellants.

{¶ 34} Linde further testified concerning the impact of appellants' affiliation with Fournier's on appellee and its franchisees in the Orlando area.  Linde stated that these franchisees, upon learning of appellants' conduct, voiced concerns about the potential loss of business they could suffer if appellee allowed appellants to continue to affiliate with their regional competitors.  The franchisees also questioned whether appellee's license agreements would protect their business interests moving forward if appellee failed to enforce the non-competition and confidentiality provisions contained therein against appellants.  As to the Semoran store, which was the franchise located closest to Fournier's, Linde testified that the store was not performing as well as other stores in the Orlando area, although he could not state with any certainty that the decline in performance was due to appellants' affiliation with Fournier's.  Nonetheless, Linde stated that some franchisees were concerned that the Semoran store's poor performance was attributable to appellants' involvement with Fournier's.

18.

{¶ 35} Linde testified that there are automotive service shops near appellants' residence that are located more than five miles away from any Tuffy shops. For example, Linde stated that appellants' residence is located approximately as close to Daytona as it is to Orlando, and there are no Tuffy franchises in Daytona.

{¶ 36} Following Linde's testimony, appellee called its chief financial officer, Gary Swartzbeck, as its final witness. Swartzbeck first learned of appellants' departure from Tuffy in early 2021. At that time, Swartzbeck learned of a dispute between appellants and their business partners that had caused the groups to decide to part ways.

{¶ 37} Sometime in the middle of 2021, Swartzbeck began to hear "a lot of chatter from * * * franchisees in the Central Florida area" about appellants' formation of a new limited liability company and eventual employment with Fournier's. Specifically, Swartzbeck stated that the franchisees at two locations (including the Semoran store) contacted him and asked for a conference call with him, Schmitt, and appellee's chief executive officer to "vent their displeasure of what was going on and really kind of wanting us to know, hold up our end of the bargain of them being a family and protecting them and their rights as franchisees of Tuffy."

{¶ 38} Swartzbeck was asked to elaborate as to the likely financial ramifications to appellee if it failed to enforce its license agreement with appellants in this case. He responded:

19.

I think you'll have a lot more turmoil in the franchisee community, the dealer community. You know, people expect when they pay a fee to become a member of a brand, in our case a Tuffy family, and then they pay those ongoing royalty fees, they expect to have the protection, they expect all the members of the Tuffy family to live up to their expectations. So if that's not honored, I think they all feel hurt. They all feel damaged. And I think it makes it very difficult for us to have – to talk to our franchisees because they kind of have a grudge against corporate for not enforcing these things. I think it makes it difficult for [Schmitt] to go after and bring new franchisees into the system.

* * *

It's hard for me to say dollar-wise. It's more about relationship damage than it is about financial damage.

{¶ 39} Swartzbeck went on to testify that failure to enforce the license agreement in this case would impact appellee's ability to resolve future disputes with other franchisees. Swartzbeck surmised that franchisees could attempt to use appellants' competitive behavior, and appellee's failure to challenge it, to justify a refusal to pay franchise dues, claiming that appellee's failure to protect them caused them to suffer a loss in sales.

20.

{¶ 40} At the conclusion of Swartzbeck's testimony, appellee rested. Following admission of appellee's exhibits, the following colloquy took place between the court and the parties:

THE COURT: As I said before, I would anticipate having briefing begin and I know, folks, that you want to take that opportunity to file a brief before – on or before January 7th, correct?

[ASHLEY]: Yes. We don't do any kind of like a closing?

THE COURT: I was going to provide you that opportunity, but I wanted to make sure that we kind of make sure that we get there in the right order. So the plaintiff is now resting with the admission of the exhibits?

[APPELLEE'S COUNSEL]: Right, yes.

* * *

THE COURT: And I believe, [Ashley], you said you'd like to give a closing statement, correct?

[ASHLEY]: Yes, I would.

{¶ 41} Thereafter, the trial court heard closing arguments from the parties, ordered the parties to file post-trial briefs, and continued the matter for a decision at a later date. Appellants made no request to testify, and the trial court did not ask appellants if they wished to testify, prior to offering their closing arguments.

21.

{¶ 42} Upon consideration of the evidence presented at trial, the trial court issued a preliminary injunction on December 27, 2021. In its opinion, the trial court found that the non-competition and confidentiality provisions contained in the parties' license agreement were fair and reasonable, and thus enforceable under Ohio law. Further, the court found that appellants' employment with Fournier's constituted a breach of these provisions, and that appellee's witnesses provided adequate testimony to establish that appellants' continued breach of the licensing agreement "is likely to cause a negative impact on [appellee's] relationships with its existing franchisees that is difficult, if not impossible, to quantify, and harms [appellee's] good will with existing and prospective franchisees alike." Thus, the court concluded that appellee demonstrated it would suffer immediate and irreparable harm as a consequence of appellants' actions.

{¶ 43} In addition, the trial court found that enforcing the license agreement against appellants would not impose any undue hardship on them, because they would not be restricted from working in the automotive repair industry "so long as they are not working for a competing business" greater than five miles from another Tuffy Auto Service Center. Finally, the court concluded that enforcement of the license agreement furthered the public interest by promoting fair competition, enforcing contractual obligations, and preventing unfair competition. In light of its findings, the trial court granted appellee's request for a preliminary injunction and thereby enjoined appellants

22.

from engaging in competitive activity in violation of the parties' license agreement, including employment at Fournier's.

{¶ 44} On February 7, 2022, after the parties submitted their post-trial briefs, the trial court issued its "bench trial opinion, judgment entry and permanent injunction," in which the court largely reiterated the findings it set forth in its December 27, 2021 opinion and found that appellee was entitled to a permanent injunction barring appellants from continued employment with Fournier's, as well as an award of attorney's fees and costs associated with this action pursuant to the express terms of the license agreement authorizing such an award. In total, the trial court awarded appellee attorney fees, expert witness fees, and travel expenses totaling $81,457.09. Appellants do not separately challenge this award on appeal.

{¶ 45} Following the trial court's issuance of its February 7, 2022 judgment entry, appellants filed a timely notice of appeal.

## B. Assignments of Error

{¶ 46} On appeal, appellants assign the following errors for our review:

I. The trial court erred by refusing to let Ashley Reed and/or Thomas Reed testify on their own behalf in the injunction hearing against them. Plaintiffs/Appellees (sic.) would not have been either surprised or prejudiced by Appellants' testimony.

23.

II. The trial court erred by refusing to let Ashley Reed and/or Thomas Reed testify on their own behalf in the injunction hearing against them. Ohio has a pro-merits bias, and the court could not rule on the merits of the injunction without the testimony of the people against whom the injunction was sought to be enforced.

III. The trial court erred in ruling that Plaintiff would suffer irreparable injury if the injunction was not granted.

{¶ 47} Because appellants' first and second assignments of error are interrelated, we will address them simultaneously.

## II.     Analysis

### A.     Appellants' Ability to Testify

{¶ 48} In their first and second assignments of error, appellants argue that the trial court erred by denying them the opportunity to testify on their own behalf at trial.

{¶ 49} The admission of evidence is within the discretion of the trial court and the court's decision will only be reversed upon a showing of abuse of that discretion. *State v. Barnes*, 94 Ohio St.3d 21, 23, 759 N.E.2d 1240 (2002); *State ex rel. Sartini v. Yost*, 96 Ohio St.3d 37, 2002-Ohio-3317, 770 N.E.2d 584, ¶ 21. "The term 'abuse of discretion' * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

24.

{¶ 50} Here, appellants do not challenge the trial court's partial granting of appellee's motion in limine to prevent appellants from calling any non-party witnesses as a consequence of appellants' failure to file a witness list before trial. Instead, appellants argue that the trial court erred in preventing them, as parties to the proceeding, from testifying at trial. In response, appellee asserts that appellants' argument is incompatible with what transpired at the trial in this case. Having reviewed the record in its entirety, we agree with appellee that the trial court did not prevent appellants from testifying at trial. On the contrary, at the outset of trial, appellants were expressly informed by the trial court that they would be *permitted* to testify if they wished to do so.

{¶ 51} This issue arose in the trial court within the context of appellee's pretrial motions in limine, in which it sought an order from the court precluding appellants taking the stand in their own defense due to appellants' failure to file a witness list in accordance with the trial court's scheduling orders. In their brief to this court, appellants focus their attention on the arguments they raised in opposition to appellee's motion in limine, namely that appellee had ample notice of their intent to testify at trial notwithstanding their failure to proffer a witness list before trial. Appellants contend that their "names were listed in appellee's witness list and in their discovery responses. Therefore, appellant's names were properly listed as witnesses for appellee to see and know."

{¶ 52} Appellants' arguments rest on the mistaken premise that the trial court granted appellee's motion in limine and thereby precluded them from testifying. In

25.

reality, precisely the opposite occurred. Indeed, the trial court *denied* appellee's request and affirmatively indicated that it would allow appellants to testify "as on cross for the defense * * *. But if you'd like to present any testimony you think would help on your side, I'll allow that as well." As such, there is no merit to appellants' contention that they were erroneously prevented from testifying at trial in their own defense.

{¶ 53} In their reply brief, appellants assert two additional bases for their argument that they were precluded from testifying at trial. First, appellants argue that the trial court's use of the phrase "testify as on cross" was unclear. When read in its entirety, we do not find that the trial court's ruling on appellee's motion in limine was unclear. While appellants focus on the phrase "testify as on cross," they ignore the trial court's following statement, wherein the court informed them, "if you'd like to present any testimony you think would help on your side, I'll allow that as well." Even if the first statement was unclear, the trial court's follow-up statement was unambiguous.

{¶ 54} Second, appellants contend that the trial court should have directly asked appellants if they wished to testify at the close of appellee's case-in-chief. The record confirms that the trial court did not expressly inquire of appellants as to whether they wished to present testimony in their case-in-chief. Instead, the trial court moved from admission of appellee's exhibits right into a discussion about the filing of post-trial briefs. Ashley then interjected and asked, "We don't do any kind of like a closing?" The court then assured appellants that they would be given an opportunity to make closing

26.

arguments at the appropriate time.  Immediately thereafter, the trial court asked appellee's counsel if appellee was resting its case-in-chief.  Counsel responded in the affirmative and the trial court returned to Ashley and asked her if she would like to provide a closing statement, to which Ashley responded, "Yes, I would."

{¶ 55} Neither Ashley nor Thomas indicated any intent to testify after the trial was underway.  Actually, the record is devoid of appellants requesting to testify or asserting their right to testify.  Further, to the extent they were confused by the trial court's initial decision on appellee's motion in limine, it is noteworthy that appellants sought no clarification of that ruling as to, for example, what impact the ruling would have on their case-in-chief.  Admittedly, the trial court did not inquire as to whether appellants wished to take the stand to testify.  While such an inquiry may be a best practice for trial courts, appellants cite no statutory requirement or authority in the case law that obligates a trial court to ask a party if they wish to present testimony at a trial, and we have found no such authority to support that proposition.  Rather, appellants emphasize their status as pro se litigants and suggest that "any reasonable pro se litigant would have believed that they were not allowed to testify."  But the fact that a party proceeds pro se is not a reason to impose an obligation on the trial court to discern the party's wish to testify where no such obligation applies in cases involving represented parties.

{¶ 56} Pro se litigants are presumed to have knowledge of the law and legal procedures, and are held to the same standard as litigants who are represented by counsel.

27.

*In re Application of Black Fork Wind Energy, L.L.C.*, 138 Ohio St.3d 43, 2013-Ohio-5478, 3 N.E.3d 173, ¶ 22, citing *State ex rel. Fuller v. Mengel*, 100 Ohio St.3d 352, 2003-Ohio-6448, 800 N.E.2d 25, ¶ 10. "[T]he trial court/magistrate is not there to try their case or to exercise their rights for them." *Dupal v. Sommer*, 5th Dist. Stark No. 2009CA00032, 2009-Ohio-5791, ¶ 19. Moreover, "a pro se litigant may not be given any greater rights than a party represented by counsel and bears the consequences of any litigation mistakes." *Walker v. Metropolitan Environmental Services, Inc.*, 6th Dist. Lucas No. L-17-1131, 2018-Ohio-530, ¶ 4, citing *HSBC Bank United States NA v. Beins*, 6th Dist. Lucas No. L-13-1067, 2014-Ohio-56, ¶ 6. Appellants had the right to choose to proceed to trial pro se, but they bear the consequences of that decision and may not now rely upon their ignorance of courtroom procedure as a basis for their argument that the trial court committed reversible error.

{¶ 57} In light of the foregoing, we conclude that the trial court did not refuse to permit appellants to testify at trial. Rather, the trial court permitted appellants to testify, but appellants failed to assert that privilege. Appellants have demonstrated no error on the part of the trial court concerning this issue. Accordingly, we find appellants' first and second assignments not well-taken.

### B. Irreparable Harm

{¶ 58} In their third assignment of error, appellants argue that the trial court erred in granting appellee's request for a permanent injunction because appellee did not

28.

demonstrate that it is likely to suffer irreparable harm as a result of appellant's affiliation with Fournier's.

{¶ 59} The decision to grant or deny an injunction is within the discretion of the trial court, and we review that decision on appeal for an abuse of discretion. *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Management Dist.*, 73 Ohio St.3d 590, 653 N.E.2d 646 (1995), paragraph three of the syllabus. An abuse of discretion implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 60} The grant of a permanent injunction is an "'extraordinary remedy in equity where there is no adequate remedy available at law.'" *City of Toledo v. State*, 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257, ¶ 15, quoting *Garono v. State*, 37 Ohio St.3d 171, 173, 524 N.E.2d 496 (1988). Injunctive relief "is not available as a right but may be granted by a court if it is necessary to prevent a future wrong that the law cannot." *Garono* at 498.

{¶ 61} A party seeking a preliminary injunction bears the burden of establishing, by clear and convincing evidence, that "(1) there is a substantial likelihood that the plaintiff will prevail on the merits; (2) the plaintiff will suffer irreparable injury if the injunction is not granted; (3) no third parties will be unjustifiably harmed if the injunction is granted; and (4) the public interest will be served by the injunction." *Keefer v. Ohio Dept. of Job and Family Servs.*, 10th Dist. Franklin No. 03AP-391, 2003-Ohio-6557, ¶

29.

14, citing *Procter & Gamble v. Stoneham*, 140 Ohio App.3d 260, 267, 747 N.E.2d 268 (1st Dist.2000). As is typical of the law of equity, these four factors must be balanced and no individual factor in the analysis is dispositive. *Id.*

{¶ 62} The test for the granting or denial of a permanent injunction is substantially the same as that for a preliminary injunction. However, in the case of a permanent injunction, the plaintiff must prove that he *has* prevailed on the merits, not merely that there is a "substantial likelihood" of prevailing on the merits. *Miller v. Miller*, 11th Dist. Trumbull No. 2004-T-0150, 2005-Ohio-5120, ¶ 11, citing *Ellinos, Inc. v. Austintown Twp.*, 203 F.Supp.2d 875, 886 (N.D.Ohio 2002) and *Edinburg Restaurant, Inc. v. Edinburg Twp.*, 203 F.Supp.2d 865, 873 (N.D.Ohio 2002).

{¶ 63} In actions involving covenants not to compete, courts have stated that "an employer who seeks an injunction to enforce a noncompete clause must not only establish the reasonableness of the noncompete clause at issue but must also show that the employer is likely to suffer irreparable harm as a result of the employee's breach of that clause." *Brentlinger Enterprises v. Curran*, 141 Ohio App.3d 640, 646, 752 N.E.2d 994 (10th Dist.2001), citing *Levine v. Beckman*, 48 Ohio App.3d 24, 27, 548 N.E.2d 267 (10th Dist.1988).

{¶ 64} Here, appellants do not challenge the trial court's determination that the non-competition and confidentiality provisions in the parties' license agreement, which are limited both in terms of time and geographic scope, are reasonable and enforceable.

30.

Nor do appellants contest the trial court's conclusion that their employment at Fournier's is a breach of those provisions, a finding that is supported by the testimony of appellee's witnesses summarized above. Moreover, appellants do not argue that the trial court's injunction unjustifiably harms third parties or frustrates the public interest. Instead, appellants' argument that appellee failed to show irreparable injury, is limited to the second *Keefer* injunction factor. Therefore, our analysis will focus solely on that factor.

{¶ 65} A party seeking an injunction is not required to show actual harm, but must prove the existence of a threat of harm. *State v. City of Cincinnati Citizen Complaint Authority*, 2019-Ohio-5349, 139 N.E.3d 947, ¶ 26 (1st Dist.), citing *e2 Solutions v. Hoelzer*, 6th Dist. Lucas No. L-08-1295, 2009-Ohio-772, ¶ 32. This threat of harm must be "immediately apparent and concrete." *Id.* at ¶ 33. Actual threat of harm in the context of covenants not to compete "exists when the employee possesses knowledge of the employer's trade secrets and begins working in a position that causes [the employee] to compete directly with the former employer * * *." *Jacono v. Invacare Corp.*, 8th Dist. No. 86605, 2006-Ohio-1596, ¶ 38, citing *Stoneham* at 274. Further,

> a threat of harm warranting injunctive relief can be shown by facts
> establishing that an employee with detailed and comprehensive knowledge
> of the former employer's trade secrets and confidential information now
> works for a competitor of the former employer in a position that is
> substantially similar to the position held during the former employment.

31.

*Id.*

{¶ 66} "'It must be remembered that, in discussing "irreparable harm," the proper focus is not so much on what kind of damage the misappropriator has already inflicted, but what damage the misappropriator may inflict in the future. * * * [I]njunctions concern the prevention of future harm, not compensation for, or punishment of, past harm.'" *Litigation Management, Inc. v. Bourgeois*, 8th Dist. Cuyahoga No. 95730, 2011-Ohio-2794, ¶ 18, quoting Casagrande, *Permanent Injunctions in Trade Secret Actions: Is a Proper Understanding of the Role of the Inadequate at Law/Irreparable Harm Requirement the Key to Consistent Decisions?*, 28 AIPLA Q.J. 113, 132 (2000).

{¶ 67} In their pro se responses to appellee's interrogatories, appellants acknowledged that Thomas works at Fournier's as a mechanic and Ashley works at Fournier's in a clerical position. In other words, the couple are presently engaged in employment with Fournier's in positions involving the business's back office operations as well as its customer-facing operations. While appellants are not presently owners of Fournier's, it is reasonable to infer from the evidence contained in the record that appellants are using, or will at some point in the future likely use, the information they received from appellee in their employment at Fournier's. Therefore, the positions they hold are substantially similar to their former positions for purposes of the present analysis.

32.

{¶ 68} Next, we must examine the nature of the information appellants received from appellee to determine whether it constituted trade secrets. Under R.C. 1333.61(D), a trade secret is defined as

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> > (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> >
> > (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

{¶ 69} At trial, appellee offered testimony from several witnesses who explained the extensive training that appellee provided to appellants during their time as franchisees. As part of its new dealer training program, appellee schooled appellants in the Tuffy System, providing them with an abundance of proprietary information related to appellee's business processes, marketing techniques, pricing strategies, operational procedures, and the like. Following new dealer training, appellants had access to further

33.

proprietary information through appellee's provision of continuing education through Tuffy University and annual dealer meetings.

{¶ 70} According to Schmitt, this proprietary information was developed and continuously refined by appellee over a period of five decades, and was instrumental in allowing appellee's franchisees to be profitable in the highly competitive automotive services industry. In his testimony, Schmitt explained appellee includes the non-competition and confidentiality provisions in its license agreements with franchisees because the information it provides to franchisees is sensitive and valuable. Indeed, this information constitutes the "playbook" for franchisees to follow to operate a "turnkey operation."

{¶ 71} During his testimony, Linde testified that appellee's training on the "Tuffy Way" is unique in the automotive services industry. Further, Linde stated that the information appellants received during their training and franchise operations was confidential in nature. He explained that this information went beyond mechanical training, extending into areas involving business operations and management.

{¶ 72} Taken together, the foregoing testimony contains facts to establish that appellants possessed knowledge of appellee's trade secrets. The trial testimony provided by appellee's witnesses demonstrate that appellants were provided with extensive information about appellee's business operations, marketing techniques, customer and vendor lists, pricing procedures, all of which valuable because such information was not

34.

generally known outside appellee's franchise network and was kept secret by virtue of appellee's efforts in demanding confidentiality from its franchisees.

{¶ 73} Schmitt testified that an injunction preventing appellants from continuing to compete with appellee is necessary because the harm appellee would suffer on an ongoing basis from such competition would be difficult to foresee, and thus a monetary damage award would be difficult to fashion. Based upon the complaints he received from other area franchisees, Schmitt surmised that appellee would have difficulty attracting new franchisees and retaining existing franchisees if appellants were permitted to continue working for Fournier's. At least one other Ohio appellate court has found this type of evidence demonstrative of irreparable harm. *See ITS Financial, L.L.C. v. Gebre*, 2d Dist. Montgomery Nos. 25416, 25492, 2014-Ohio-2205, ¶ 26 ("There is also evidence in the record that if Gebre were permitted to breach the franchise agreements without consequence it would be difficult for ITS to sell other franchises within that market area, thereby resulting in lost revenue.").

{¶ 74} Further, Schmitt deduced that existing franchisees would interpret appellants' ongoing competitive activity as an indication that their license agreements were unenforceable, thereby encouraging them to withhold royalty payments to appellee and ignore other requirements under their respective license agreements.

{¶ 75} Schmitt's testimony regarding the harm caused by appellants' affiliation with Fournier's was echoed by Swartzbeck. Swartzbeck testified that he was contacted

35.

by two franchisees who expressed their displeasure with appellants' employment at Fournier's and demanded that appellee put a stop to such employment by enforcing the covenant not to compete in its license agreement with appellants. In light of this reaction from other franchisees, Swartzbeck was concerned that franchisees might attempt to use appellants' competitive behavior to justify a refusal to pay franchise dues, claiming that appellee's failure to protect them caused them to suffer a loss in sales. Like Schmitt, Swartzbeck testified that a monetary award would be difficult to calculate, because the damage caused by appellants' breach of the license agreement is "more about relationship damage than it is about financial damage."

{¶ 76} For their part, appellants introduced no testimony supporting their contention that their continued affiliation with Fournier's does not threaten appellee with irreparable harm. As a consequence of appellants' failure to testify, the record is devoid of any such evidence. Further, appellants failed to engage appellee's witnesses in any meaningful cross examination, which may have elicited such testimony and placed into the record facts to support appellants' assignment of error.

{¶ 77} In sum, we find that the record before us establishes by clear and convincing evidence that appellants have detailed and comprehensive knowledge of appellee's trade secrets and confidential information, and are now working for one of appellee's competitors in a position that is substantially similar to the position they formerly held with appellee. Consequently, we find that appellee demonstrated an actual

36.

threat of harm sufficient to show irreparable injury and thus meet the second *Keefer* injunction factor. Since this is the only factor challenged by appellants, we find that the trial court did not abuse its discretion in granting appellee's request for a permanent injunction.

{¶ 78} Accordingly, appellants' third assignment of error is not well-taken.

### III. Conclusion

{¶ 79} In light of the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed. The costs of this appeal are assessed to appellants under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.     _____
               JUDGE
Thomas J. Osowik, J.

               _____
Gene A. Zmuda, J.       JUDGE
CONCUR.

               _____
               JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.